PEOPLE v AYERS

Docket No. 164934. Submitted March 7, 1995, at Detroit. Decided
October 6, 1995, at 9:20 A.M.

John Ayers pleaded guilty in the Detroit Recorder's Court, Vera
Massey Jones, J., of arson of a dwelling house and burning
insured property. The defendant was sentenced to concurrent
prison terms of five to twenty years for the arson conviction
and five to ten years for the conviction of burning insured
property. The defendant appealed.

The Court of Appeals *held:*

1. The convictions of arson of a dwelling and burning insured
property, both of which related to the same house, do not
violate double jeopardy protections against multiple punish-
ment for the same offense. US Const, Am V; Const 1963, art 1,
§ 15. Statutes prohibiting conduct that violates distinct social
norms can be viewed as separate and amenable to permitting
multiple punishments. The focus of the statute proscribing
arson of a dwelling, MCL 750.72; MSA 28.267, is on preventing
the burning of dwellings, while the focus of the statute pro-
scribing the burning of insured property, MCL 750.75; MSA
28.270, is on preventing insurance fraud. The former statute
protects persons who may be endangered by the burning of
dwellings and the latter statute protects insurers from fraud.
The statutes provide for two distinct offenses that have differ-
ent elements and that are not part of a hierarchy of related
offenses or a scheme of increased punishment for aggravating
conduct.

2. The trial court did not err in refusing to dismiss the
charges on the basis of an alleged promise by a police officer to
the defendant of immunity from prosecution in exchange for a
confession. The remedy for an unauthorized agreement for
immunity from prosecution is suppression of evidence, not
dismissal of charges.

3. Remand is required for further proceedings regarding the

REFERENCES

Am Jur 2d, Arson and Related Offenses §§ 27, 55; Criminal Law
§ 221.

See ALR Index under Arson; Exclusion and Suppression of Evi-
dence; Privileges and Immunities.

scoring of Offense Variable 8 for the arson conviction, which allows the scoring of ten points if an offense is part of a pattern of criminal activities over a period, from which a substantial portion of the offender's income is derived. The trial court acted within its discretion in considering the instant offense part of a pattern of criminal activities over a period, but failed to fully address the question whether the defendant derived a substantial portion of his income from the pattern of criminal activities.

Affirmed, but remanded.

1. ARSON — ARSON OF A DWELLING — BURNING INSURED PROPERTY — DOUBLE JEOPARDY.

Convictions of arson of a dwelling and burning insured property relating to the burning of the same dwelling do not violate double jeopardy protections against multiple punishment; the statutes proscribing the offenses address distinct social norms and require proof of different elements for conviction (US Const, Am V; Const 1963, art 1, § 15; MCL 750.72, 750.75; MSA 28.267, 28.270).

2. CRIMINAL LAW — UNAUTHORIZED AGREEMENTS FOR IMMUNITY FROM PROSECUTION — SUPPRESSION OF EVIDENCE.

The remedy for an unauthorized agreement of immunity from prosecution in exchange for a confession is suppression of evidence of the confession, not dismissal of the charges.

3. SENTENCES — ARSON OF A DWELLING — SENTENCING GUIDELINES — PATTERN OF CRIMINAL ACTIVITIES.

Points may be scored under Offense Variable 8, which involves continuing patterns of criminal behavior, of the sentencing guidelines for arson where the offense is part of a pattern of criminal activities over a period, from which a substantial portion of the offender's income is derived.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of Research, Training, and Appeals, and *Joseph A. Puleo,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Susan M. Meinberg*), for the defendant on appeal.

Before: White, P.J., and Bandstra and W. P. Cynar,* JJ.

Per Curiam. Defendant conditionally pleaded guilty of arson of a dwelling house, MCL 750.72; MSA 28.267, and burning insured property, MCL 750.75; MSA 28.270. He was sentenced to concurrent terms of five to twenty years for the arson conviction and five to ten years for the conviction of burning insured property. He now appeals as of right. We affirm, but remand.

Defendant was charged with the two offenses after he went to the police and confessed his participation in the burning of a house belonging to codefendant Peter Kosciolek. Defendant filed a motion to dismiss, asserting that his confession was induced by a promise of immunity, and that he was entitled to specific performance of that promise. An evidentiary hearing was held, and the court denied defendant's motion. Immediately thereafter, defendant tendered his conditional plea of guilty, expressly reserving the right to appeal the court's ruling denying his motion to dismiss.

At the evidentiary hearing, Detective-Sergeant Joseph Wedesky of the Romulus Police Department testified that he was contacted by Charles Sprinkle on July 8, 1992. Sprinkle said he had purchased a tractor-mower from Peter Kosciolek, but had also heard that Kosciolek had reported the mower stolen and had collected the insurance proceeds. Defendant, who was staying with Sprinkle, then told Wedesky that he had a "friend" who was a witness to an arson and was looking for some kind of immunity. Wedesky asked defendant what his friend knew, and defendant stated that Peter Kosciolek's house had been intentionally set

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

on fire. Wedesky told defendant he would check with the prosecutor's office to see whether any type of immunity might be available. Defendant was not considered a suspect at this point.

After speaking to defendant, Wedesky retrieved the report regarding the fire at Kosciolek's house, which occurred in October 1991. The case was "pretty much closed," but the report classified the fire as one of a "suspicious nature," and noted that an anonymous telephone call had been received reporting that a fireman had knowledge that the fire was intentionally set. Wedesky then spoke to assistant prosecutor Doug Baker, who told Wedesky that there "could possibly" be some kind of immunity if the person had a character beyond reproach, had no criminal history, and was absolutely truthful about everything. Additionally, Wedesky checked with a confidential informant who was familiar with the community. The informant did some checking and then informed Wedesky the next day that a person named "John" had burned Kosciolek's house. The informant did not know the last name of the person, but said she could find out. At that point, Wedesky began suspecting defendant. Wedesky checked defendant's record and discovered that he had a criminal history.[1]

Wedesky next spoke to defendant by telephone on Friday, July 10, 1992. Wedesky testified that he told defendant that he knew that he had set the fire, but defendant denied doing so. Wedesky also claimed that he informed defendant that the prosecutor had stated that immunity might be granted only "if the person didn't have any criminal history and had an outstanding character and never

---

[1] The presentence report indicates that defendant has five prior felony convictions and three prior misdemeanor convictions, all for property offenses.

told any lies." Wedesky said he told defendant he was not eligible because he had a criminal history. Defendant asked to meet with Wedesky on the following Monday, and Wedesky agreed.

Wedesky met with defendant as planned on Monday, July 13, and defendant gave a written statement confessing his participation in the intentional burning of Peter Kosciolek's house. Defendant said that Kosciolek offered him a stereo, a television, two videocassette recorders, and a telephone if he would burn the house, and he agreed. Kosciolek subsequently contacted defendant, informing him that everyone was out of the house, and defendant went over and started a fire in a closet. Defendant received the items that he was promised, but Kosciolek subsequently took them back, promising to pay defendant $2,000 after receiving the insurance money. Later, Kosciolek paid defendant only $900.

Before defendant gave his written statement, Wedesky wrote out the following, which appears at the beginning of the statement:

> I have not read John Ayers his Constitutional Rights prior to him making verbal and written statement. I have made no threats or promises to John Ayers.

At the end of the statement, defendant wrote out the following:

> I'm making this statement with the prosecutor's word if it's true I will have immunity when I testify. I won't be prosecuted.

Wedesky testified that he did not offer or promise defendant immunity before obtaining his statement, nor was he authorized to do so. To the

contrary, Wedesky stated, "I told him that there was no immunity—I said, I couldn't promise it." Wedesky acknowledged that the reason why he did not read defendant his constitutional rights was that assistant prosecutor Baker told him not to do so.

Wedesky testified that he also learned of defendant's participation in the burning of Kosciolek's house from several independent sources, none of whom were mentioned in defendant's statement. Specifically, Wedesky received some anonymous telephone calls in July 1992, from a person later identified as Glen Perone, who is a friend of Peter Kosciolek. Wedesky finally met Perone at a restaurant on July 10, and then obtained written statements from Perone on July 13 and 22. Perone advised Wedesky of the various people who had information about the case, including John Kosciolek, who is the son of codefendant Peter Kosciolek, and Patricia Ayers, who is defendant's ex-wife. Wedesky also spoke to Colin Gabbard, a fireman, after defendant had made a complaint accusing Gabbard of stealing some items from him. Gabbard provided Wedesky with information concerning the arson. Wedesky took a written statement from Gabbard on July 15. Wedesky also spoke to Dave Allison, an arson investigator for Romulus, and Rich Cahn, the insurance agent who investigated the case. Additionally, Wedesky spoke to the codefendant, Peter Kosciolek, who confessed to the crimes.

Anthony Perone[2] was called as a witness and acknowledged making "one or two" anonymous telephone calls in July 1992 concerning the involvement of defendant and Peter Kosciolek in the burning of Kosciolek's house. Perone formerly was

---

[2] Although Wedesky referred to a Glen Perone and the witness is named Anthony Perone, it appears that they are the same person.

defendant's father-in-law and works for the Dearborn Police Department. Perone acknowledged meeting with Wedesky at a restaurant on July 10, and then giving a written statement on a later date.

Defendant testified that when he initially spoke to Wedesky, Wedesky informed him that he would have to check with the prosecutor regarding immunity, but told him "there was a good chance that if the person [with the information] came forward they would get immunity because the case was nothing to prove it." Defendant next spoke with Wedesky on the telephone on July 10. Defendant testified regarding his conversation with Wedesky:

> [H]e said that he had spoken with Doug Baker or Barker, the prosecuting attorney and that Baker had said that—or whoever this person was, if they would come forward and give a true and factual statement if necessary and be willing to testify in court, that they would have immunity if they didn't have a serious criminal record.
>
> At that time I said what do you call serious. And he said, murder, armed robbery, rape, if you have repeat cases, like that. Then the person probably wouldn't get immunity.
>
> If there is a little minor thing, then there shouldn't be any problem with it. And he said, okay, I'll get back with you again. And I said, so, what's the deal. And he said, well, I think you are the one who set the fire.
>
> And I said, well, what about the immunity? At that time he said if you come forward and give a statement and it's factual and you prove what you say is true and you are willing to testify, there will be some type of immunity granted.
>
> He asked me can he come that day and take a statement. And I said, no. Would you wait until Monday so that there is somebody here besides me to be a witness to what's going on.

And he said, okay. But, you better do it quick. Because Pete's going to make an immunity deal.

Defendant subsequently met with Wedesky on July 13 and gave a written statement. Defendant's friend, Karen Rose, was present as a witness, and also present was Sergeant Early (or Sergeant Snyder according to Wedesky). Defendant described the circumstances surrounding his giving of the statement:

I said, so, what about the immunity? And he said, well, let's take the statement first and see if this thing is true. He said, if you show that what you say is true, then it shouldn't be any problem.

So, he asked me verbally first to give my statement. I did. And then he asked me to write it, and I said, the whole thing? And he said, well, the most important part of it.

And so after that, I wrote the statement out. And I put on the bottom about the immunity. Because he had told me if it was necessary, I may have to testify against Pete. And I said, I don't have any problem with it.

Okay. So, at that time, Sergeant Wedesky said, I don't know about you putting this immunity thing in here. And Sergeant Early said, that's not a problem about it. He's got immunity.

Defendant stated that, without immunity, he never would have given a statement.

At the conclusion of the hearing, defense counsel requested an adjournment because two other witnesses, Charles Sprinkle and Karen Rose, were not present. The court refused to adjourn the hearing, observing that it had been adjourned twice before.

In a decision from the bench, the court denied defendant's motion to dismiss, ruling that, even if defendant understood that he was going to get immunity—although not supported by the record

—the appropriate remedy was not dismissal, but rather suppression of any evidence flowing from defendant's statement. The court then found that the statements of the witnesses and the other evidence in the case did not flow from defendant's statement, but instead were derived from independent sources, and refused to suppress the additional evidence.

I

Defendant first argues that his convictions of both arson of a dwelling and burning insured property violate the Double Jeopardy Clause's prohibition against multiple punishment. US Const, Am V; Const 1963, art 1, § 15.

The protection against multiple punishment for the same offense is designed to ensure that courts impose sentences within the limits set by the Legislature. *People v Sturgis,* 427 Mich 392, 399; 397 NW2d 783 (1986). Since the power to define crime and fix punishment is wholly legislative, the Double Jeopardy Clause is not a limitation on the Legislature, and the Legislature may specifically authorize penalties for what would otherwise be the "same offense." Cumulative punishment of the same conduct does not necessarily run afoul of the Double Jeopardy Clause in either the federal or state system, *id.* at 400; the determinative inquiry is whether the Legislature intended to impose cumulative punishment for similar crimes. *Id.; People v Robideau,* 419 Mich 458, 485-486; 355 NW2d 592 (1984).

Defendant asserts that this Court's decision in *People v Kedziora,* 125 Mich App 150, 153; 336 NW2d 460 (1983), is dispositive. In *Kedziora,* this Court held that multiple convictions of arson of a dwelling and burning insured property arising out of a single criminal act violate the double jeopardy

prohibition against multiple punishments for the same offense. In a similar case, *People v Hanna,* 85 Mich App 516, 526; 271 NW2d 299 (1978), this Court held that multiple convictions of burning other real property and burning insured property arising from a single criminal act violate double jeopardy protections. Although these cases would appear to be dispositive, their holdings must be reevaluated because they were influenced by the concept of "factual double jeopardy," which has since been repudiated by our Supreme Court in the multiple punishment context.

In analyzing multiple punishment double jeopardy claims, courts formerly employed at times either the *Blockburger*[3] "required evidence" test, which involves inquiry into whether each statute requires proof of a fact that the other does not, or an "actual evidence" test, which focuses on whether the same proofs are used to establish the elements of each offense. See *Sturgis, supra* at 404. Consistent with these approaches, this Court in *Kedziora* observed that "when the proof of one offense results necessarily in proof of the other, the two offenses blend together so as to constitute a single criminal act." 125 Mich App 152-153. Similarly, the cases cited as controlling in *Hanna* are cases employing a factual double jeopardy analysis.

However, our Supreme Court has since rejected those approaches. In *Robideau, supra* at 485-486, the Court said:

[P]rior decisions of this Court have applied a factual test in single-trial multiple-punishment cases, creating areas in which arguably the Legislature cannot now act. To the extent that those decisions interpret the prohibition against double

---

[3] *Blockburger v United States,* 284 US 299; 52 S Ct 180; 76 L Ed 306 (1932).

jeopardy as a substantive limitation on the Legislature, we now disavow them.

We are therefore left only with the question of what the Legislature intended in cases such as those at bar. As a means of determining that end, we find the *Blockburger* [*v United States,* 284 US 299; 52 S Ct 180; 76 L Ed 306 (1932)] test to have questionable status in the Supreme Court of the United States and find the propriety of its use in any case to be questionable. When applied in the abstract to the statutory elements of an offense, it merely serves to identify true lesser included offenses. While it may be true that the Legislature ordinarily does not intend multiple punishments when one crime is not completely subsumed in another, *Blockburger* itself is of no aid in making the ultimate determination.

\* \* \*

The difficulties with the *Blockburger* test lead us to the conclusion that it should be abandoned. . . . We, therefore, find it within our power to reject the *Blockburger* test, preferring instead to use traditional means to determine the intent of the Legislature: the subject, language, and history of the statutes.

Similarly, in *Sturgis, supra* at 404-405, our Supreme Court stated:

This Court has now clearly rejected the actual evidence double jeopardy test, and the "wooden application" of *Blockburger,* in favor of the more flexible, and traditional means of determining the intent of the Legislature. . . .

In *Robideau,* the Court provided guidelines for determining legislative intent:

Statutes prohibiting conduct that is violative of distinct social norms can generally be viewed as separate and amenable to permitting multiple punishments. A court must identify the type of

harm the Legislature intended to prevent. Where two statutes prohibit violations of the same social norm, albeit in a somewhat different manner, as a general principle it can be concluded that the Legislature did not intend multiple punishments. . . .

A further source of legislative intent can be found in the amount of punishment expressly authorized by the Legislature. Our criminal statutes often build upon one another. Where one statute incorporates most of the elements of a base statute and then increases the penalty as compared to the base statute, it is evidence that the Legislature did not intend punishment under both statutes. The Legislature has taken conduct from the base statute, decided that aggravating conduct deserves additional punishment, and imposed it accordingly, instead of imposing dual convictions.

We do not intend these principles to be an exclusive list. Whatever sources of legislative intent exist should be considered. If no conclusive evidence of legislative intent can be discerned, the rule of lenity requires the conclusion that separate punishments were not intended. [419 Mich 487-488.]

Turning to the case at hand, the statute proscribing the burning of a dwelling provides:

Any person who wilfully or maliciously burns any dwelling house, either occupied or unoccupied, or the contents thereof, whether owned by himself or another, or any building within the curtilage of such dwelling house, or the contents thereof, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 20 years. [MCL 750.72; MSA 28.267.]

The statute proscribing the burning of insured property provides:

Any person who shall wilfully burn any building

> or personal property which shall be at the time insured against loss or damage by fire with intent to injure and defraud the insurer, whether such person be the owner of the property or not, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 10 years. [MCL 750.75; MSA 28.270.]

We conclude that the two statutes are aimed at prohibiting conduct affecting distinct social norms. The focus of the statute proscribing arson of a dwelling is on preventing the burning of dwellings. The offense has been characterized as one against habitation. *Snyder v People,* 26 Mich 105, 106 (1872). The focus of the statute proscribing the burning of insured property is the prevention of fraud. Under the statute proscribing the burning of insured property, neither the character of the building nor the character of the property is relevant. Moreover, the statutes are aimed at protecting different classes of people. The arson statute is apparently aimed at protecting persons who may be endangered by fires in dwelling houses. The statute proscribing the burning of insured property is aimed at protecting insurers from being defrauded.

The structure of the two statutes may also be indicative of legislative intent. Although the *Blockburger* test has been rejected as a conclusive test, its use may be helpful in determining whether there are two offenses or one. In *Sturgis, supra* at 409, the Supreme Court explained:

> We have rejected the contention that we are constitutionally bound to apply the *Blockburger* test. We note, however, that asking the *Blockburger* question, "whether each provision requires proof of a fact which the other does not," . . . may be helpful in determining whether there are two offenses or only one, because this inquiry is really

a "rough proxy" for analysis of the essential issue. "[B]y asking whether two separate statutes each include an element the other does not, a court is really asking whether the legislature manifested an intention to serve two different interests in enacting the two statutes." [Citations omitted.]

The offense of arson of a dwelling requires that the subject of a burning be a dwelling or its contents, or a building within the curtilage of a dwelling or its contents. The offense of burning insured property does not require that the subject property be linked to a dwelling. To the contrary, the statute applies to all property, whether real or personal. Additionally, the offense of burning insured property requires that the property at issue be insured and that the perpetrator act with an intent to defraud the insurer, elements which are not a part of, and are unrelated to, the offense of arson of a dwelling. Thus, the statutes do not involve a hierarchy of offenses, i.e., a situation where one statute incorporates most of the elements of a base statute and then increases the penalty based on the presence of aggravating conduct.

Accordingly, defendant's two convictions do not violate the double jeopardy protection against multiple punishments.

II

Defendant next argues that the trial court erred in denying his motion to dismiss. In reaching its decision, the trial court relied on *People v Gallego,* 430 Mich 443; 424 NW2d 470 (1988), which held that where a defendant had entered into an unauthorized agreement with the police providing that he would be immune from prosecution, but was later prosecuted, the remedy was not specific performance of the unauthorized agreement, but

rather suppression of evidence. Defendant contends that *Gallego* is distinguishable. We disagree.

In *Gallego,* the defendant participated in an undercover drug transaction and, during a subsequent police chase, discarded $33,000 in drug-buy money at an unknown location. When the defendant was apprehended, a police agent, without consulting the prosecutor's office, promised the defendant immunity from prosecution in exchange for the $33,000. The defendant agreed and a writing formalizing the agreement was executed. However, the prosecutor's office, not feeling bound by the agreement, later brought charges against the defendant, who thereafter filed a motion to dismiss, asserting that he was entitled to specific performance of the immunity agreement. The district court agreed and dismissed the case. The circuit court affirmed, and the Court of Appeals reversed.

The Supreme Court, observing that "the police possess neither the authority to withhold prosecution nor to grant immunity," held that specific performance was not an appropriate remedy. The Court stated:

> We base our decision to deny defendant specific performance on the fact that the police lacked the authority to make a binding promise of immunity or not to prosecute. The case at bar involves a nonplea agreement for which specific performance amounts to preclusion of an otherwise valid prosecution, and the Court has available an alternative remedy short of specific performance, i.e., suppression, which essentially restores defendant to the position he enjoyed prior to making the agreement in question with the police. [430 Mich 452.]

Defendant argues that *Gallego* is not controlling because here "there was evidence that Wedesky was expressly authorized or clothed with apparent

authority to relay information to [defendant] that the prosecutor had authorized the grant of immunity," and because defendant had an understanding that the prosecutor had authorized an agreement giving him immunity.

However, the trial court found, after observing the witnesses' demeanor and considering their testimony, that the prosecutor had not authorized immunity and the police officer did not tell defendant that he did. Thus, the court did not err in applying *Gallego* and concluding that the appropriate remedy, assuming defendant believed he had immunity, would be to suppress his statement.

III

Defendant next contends that the court erred in assessing ten points for Offense Variable (OV) 8. The sentencing information report (SIR) prepared for defendant's conviction of arson of a dwelling recommends a minimum sentence range of two to eight years. Defendant argues that he was improperly scored ten points for OV 8. Absent a score of ten points for OV 8, the new guidelines recommendation would be 1½ to 5 years.

Appellate review of guidelines calculations is very limited. *People v Daniels,* 192 Mich App 658, 674; 482 NW2d 176 (1992). A sentencing court has discretion in determining the number of points to be scored provided that there is evidence on the record that adequately supports a particular score. *Id.* A trial court's scoring of the sentencing guidelines will be upheld if there is evidence to support the score. *People v Hernandez,* 443 Mich 1, 16; 503 NW2d 629 (1993).

Ten points may be scored for OV 8 if

[t]he offense is a part of a pattern of criminal activities over a period of time from which the

offender derives a substantial portion of his or her
income . . . .

At sentencing, defense counsel objected to the
scoring of ov 8, asserting "[t]his is not something
that fits into a pattern where he's earned an
income from it." The court ruled that a score of
ten points was proper, stating:

> It does appear to be a continuing pattern. And
> I'm the fact finder. And I'm going to say that he is
> entitled to that ten points on the testimony that I
> heard in this trial.

The "pattern of criminal activities" prong of ov
8 requires consideration of two different factors: (1)
whether the offense in question is part of a pattern
of criminal activities over a period and (2) whether
the defendant derived a substantial portion of his
income from the criminal activities involved. *People v Johnson,* 144 Mich App 497, 501; 376 NW2d
122 (1985).

Regarding the first factor, the presentence report indicates that defendant committed the instant offense on October 18, 1991, and that he had
the following prior convictions:

1980 - attempted breaking and entering
1980 - burglary
1980 - grand larceny
1984 - larceny under $100
1984 - receiving/concealing stolen property
    over $100
1985 - larceny in a building
1987 - attempted arson
1989 - receiving/concealing stolen property
    over $100

Defendant also had a charge of first-degree retail
fraud pending at the time of sentencing. In view of
defendant's criminal history, the court acted

within its discretion in considering the instant offense a part of a pattern of criminal activities over a period.

Regarding the second inquiry, the record discloses that defendant received income from the instant offense. Additionally, the presentence report indicates that defendant has not worked since 1986 because of poor health problems. However, the report reflects that defendant received Supplemental Security Income benefits. The amount of the benefits is not disclosed. Under ov 8, ten points may be scored only if defendant was deriving a substantial portion of his income from his criminal activities. In ruling regarding ov 8 at sentencing, the court did not address whether defendant received a substantial portion of his income from criminal activities.

Because the record does not indicate whether defendant was deriving a substantial portion of his income from his criminal activities, and because the court did not discuss this factor at sentencing, remand for further proceedings is required. On remand, the court should resolve the question whether defendant was deriving a substantial portion of his income from his criminal activities or, alternatively, determine whether different sentences would be imposed if the ten points were not scored for ov 8. If the court is unable to determine that defendant derived a substantial portion of his income from his criminal activities, defendant should be resentenced unless the court determines that it would impose the same sentences even without the ten points.[4] *People v Polus,* 197 Mich App 197, 201-202; 495 NW2d 402 (1992).

Affirmed, but remanded. We do not retain jurisdiction.

---

[4] Defendant does not contend that his sentences are disproportionately excessive, and the five-year minimum sentences are within the "corrected" guidelines.