Lawrence R. BELL, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

Lawrence R. Bell, Appellant (Defendant),

v.

The State of Wyoming, Appellee (Plaintiff).

Nos. 98–359, 98–360.

Supreme Court of Wyoming.

Jan. 13, 2000.

Rehearing Denied Feb. 8, 2000.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; Diane Courselle, Director of the Wyoming Defender Aid Program; L. Kirk Nurmi, Student Director of the Wyoming Defender Aid Program; and Katina Francis and Julia Tyson, Student Interns for the Wyoming Defender Aid Program.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Robin Sessions Cooley, Senior Assistant Attorney General.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

MACY, Justice.

Appellant Lawrence Bell appeals from two orders entered in two separate cases. The first order sentenced Bell to serve not less than five nor more than ten years in the Wyoming State Penitentiary after a jury found him guilty of conspiring to commit aggravated burglary. The second order, which was entered after a jury convicted Bell of one count of third-degree sexual assault and two counts of interference with the custody of a minor, sentenced Bell to serve terms in the Wyoming State Penitentiary of not less than nine nor more than fifteen years for the third-degree sexual assault conviction and of not less than three nor more than five years for each interference with the custody of a minor conviction. All the sentences were ordered to run consecutively.

We affirm.

## ISSUES

Bell presents the following issues for our review:

1. Did the District Court err in refusing to permit Paul Skog to withdraw as counsel for Mr. Bell in both cases, when there was ample evidence of a complete breakdown of the attorney-client relationship; and was Skog's performance as counsel so deficient as to violate Mr. Bell's right to the effective assistance of counsel?

2. Did the District Court err in making comments to the jury during deliberations which impermissibly coerced the jury into reaching a verdict in violation of Mr. Bell's sixth amendment rights?

3. Did the District Court err in failing to sever the third degree sexual assault charges against Mr. Bell from the interference with custody charges, when the charges were based on unrelated incidents, and joinder prevented Mr. Bell from effectively presenting a defense on the custodial interference charges?

4. Did the District Court err in allowing the jury to hear impermissible evidence of Mr. Bell's prior bad acts which impermissibly suggested that he had a propensity to sexually assault young women?

5. Did the District Court err in permitting Mr. Bell to be twice convicted and punished for the single continuous act of allegedly taking [the victim] to Utah and keeping her there?

### FACTS

#### A. Conspiracy to Commit Aggravated Burglary Case

On September 22, 1996, Bell, Jeanette Price, and Earl Nowatney devised a plan to burglarize Bell's brother's home. Bell was familiar with the house. He instructed the others on the best way to gain entry and on where to find the targeted items. The next morning, Nowatney and Price broke into the back door and took several jewelry boxes along with the jewelry inside, four guns, a blanket, and a violin. Bell accompanied Nowatney and Price but remained outside.

Bell's brother subsequently became suspicious that Bell was involved with the burglary of his home after finding a blanket that was taken during the burglary at their mother's home. He also found some pawn shop slips. The brother visited one of the pawn shops and discovered one of his stolen guns. He was also informed that another one of his guns had been at the pawn shop but had recently been sold. When Bell learned that his brother knew he had been involved in the burglary, Bell disclosed where the remaining items were hidden.

Bell was charged with conspiracy to commit aggravated burglary. The information also accused Bell of being a habitual offender. The trial court appointed counsel to represent Bell and later appointed another attorney to second-chair in the case. The case went to trial, and the jury found Bell guilty of conspiring to commit aggravated burglary. Bell appeals to this Court.

#### B. Third–Degree Sexual Assault & Interference with Custody Case

Bell met the victim in 1997 when Bell agreed to hire the victim and her friend to help him deliver telephone books around the Evanston community. At the time, Bell was thirty-two, the victim was fifteen, and her friend was fourteen years old. The victim's friend worked for Bell only one day in part because she was uncomfortable with sexual comments that Bell had made to her throughout the day. After work, Bell and the victim routinely drove to Salt Lake City, Utah, to buy drugs, telling her parents that they had worked late.

After one of their trips to Salt Lake City, Bell and the victim had their first sexual encounter. These encounters continued over the course of the next few weeks. During this time, the victim was not getting along with her father, and she decided to run away with Bell. On September 4, 1997, she climbed out of her bedroom window. She met Bell, who was waiting for her near her house, and they drove to Salt Lake City. The couple quickly ran out of the $480 they had withdrawn from the victim's savings account, and the victim started prostituting herself. The victim testified that Bell taught her how to be a prostitute and supplied her with a false identity and social security number in case she was stopped by the police.

Bell periodically returned to Evanston to visit his mother. During these visits, the victim hid in the brush next to the Wasatch Road exit outside of Evanston and waited for Bell to return. During one such visit, Bell was confronted by the police and the victim's parents who demanded to know where the victim was. Bell told them that he did not

know. The victim's parents testified that Bell also said that there was nothing they could do about it even if he did know where she was.

On October 4, 1997, the victim and Bell were arrested in Salt Lake City for prostitution and for procuring prostitution respectively. Once the victim's true identity was discovered, Utah authorities learned that she had been reported missing from Evanston.

An information was filed in Wyoming, charging Bell with two counts of third-degree sexual assault and with two counts of custodial interference with a minor. He was appointed counsel and pleaded not guilty to all the charges. He filed a motion to sever the two counts of third-degree sexual assault from the two counts of custodial interference. The trial court denied the motion, finding that the alleged acts were all part of the same transaction or occurrence. Bell also filed a motion in limine to exclude evidence of other bad acts, specifically evidence regarding Bell's advances toward the victim's friend. The trial court reserved its ruling until the time of trial but opined that the evidence seemed to be relevant and not unfairly prejudicial. A trial was held, and the jury found Bell guilty of one count of third-degree sexual assault and of two counts of custodial interference. It acquitted him of one count of third-degree sexual assault. Bell appeals to this Court.

## DISCUSSION

### I. Appointed Counsel

The same defense attorney was appointed to represent Bell in both cases. Bell contends that the trial court erred by denying his motions to allow counsel to withdraw when communications between them broke down, arguing that such denials resulted in his inability to receive effective assistance of counsel in both of his cases. The state counters that, although there may have been dissension between Bell and his attorney that resulted in some lack of communication, this lack of communication was remedied by the appointment of a second-chair counsel in both cases to assist with communications and with trial preparations.

### A. Motion to Withdraw

■. We review the refusal to appoint substitute counsel under the abuse of discretion standard:

While a trial court has the power in its discretion to appoint substitute counsel, its refusal to do so is not error unless an abuse of discretion is shown. A factual showing of good cause for the appointment of substitute counsel is essential to the demonstration of an abuse of discretion, and good cause is to be found in incompetence, commitment to a position or an interest which would conflict with the furnishing of an effective defense to the accused, or other good reason to conclude that appointed counsel is unable to furnish effective assistance.

*Irvin v. State*, 584 P.2d 1068, 1071 (Wyo. 1978).

■ Bell's counsel was working on both the aggravated burglary and the sexual assault/custodial interference cases simultaneously. At Bell's request, his counsel filed motions to withdraw as counsel in both cases as a result of their differing opinions regarding the case strategies and because of their inability to communicate with one another. The trial court held hearings on each motion during which time it considered each of Bell's complaints and quizzed his attorney on what he had been doing on the cases. The trial court determined that Bell's counsel was effectively handling the cases. The trial court denied both motions but did agree to appoint co-counsel and continue the trials in both cases.

The United States Supreme Court has ruled that the Sixth Amendment does not guarantee a meaningful relationship with appointed defense counsel. *Morris v. Slappy*, 461 U.S. 1, 13–14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

[T]he purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adver-

sarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic*, 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

After reviewing Bell's arguments in conjunction with the record, we are unable to find any reason that would constitute good cause to order a substitute counsel. We agree with the trial court's explanation that: "[Y]ou don't have to like [your counsel] and [your counsel] doesn't have to like you. Personalities are not the test, Mr. Bell. The test is whether you have an effective, legal counsel representing you." The trial court provided Bell with the assistance of two capable attorneys in both of his cases which was certainly more than what is required.

### B. Effective Assistance of Counsel

Bell complains that, as a result of the trial court's refusal to allow his counsel to withdraw, he was denied effective assistance of counsel in both of his cases. Specifically, he makes the following arguments: that his counsel failed to recognize or attempt to remedy significant problems with the charges against him; that his counsel failed to perform minimal legal research to rebut the state's assertion that a habitual criminal allegation was appropriate; that his counsel failed to conduct adequate investigations; and that his counsel made serious trial errors by not cross-examining a witness in the burglary case and by allowing leading questions of the victim and failing to object to the victim's friend's testimony in the sexual assault/custodial interference case. The state responds that, although Bell points to various factors in claiming ineffective assistance of counsel, he has failed to demonstrate how any of them rendered his representation defective or how they prejudiced the outcome of his trials.

■ To succeed on an ineffective assistance of counsel claim, the appellant must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Smith v. State*, 959 P.2d 1193, 1198 (Wyo.1998). We begin this analysis with the strong presumption that

counsel's representation was adequate and reasonable and, therefore, effective. *Cureton v. State*, 950 P.2d 544, 546 (Wyo.1997).

■ We have reviewed the relevant portions of the record and conclude that Bell's attorney's performance was not deficient. Most of what Bell complains about occurred during the pretrial stages and was sorted out before the trials ever began. Additionally, Bell has totally failed to demonstrate how any of the ·perceived incompetencies prejudiced the outcomes of his trials. In fact, at the conclusion of the trial in the aggravated burglary case, the trial court conducted a fairly in-depth examination of Bell to determine whether Bell was satisfied with the representation he received from his counsel. Bell assured the judge that, although he was initially concerned with his representation, he was ultimately satisfied with his counsel's performance, and we see nothing in his brief to convince us that he should have answered that inquiry differently.

### II. Comments to Jury

■ Bell complains about the comments that the trial judge made to the jury during its deliberations in the sexual assault/custodial interference case, claiming that they coerced the jury into reaching a verdict. Statements made by a judge to a jury that appears to be having trouble reaching a unanimous decision must not be coercive. *Smith v. State*, 564 P.2d 1194, 1201 (Wyo. 1977). "Communications from a judge to a jury are coercive when they possess the substantial propensity of prying minority jurors loose from beliefs they honestly have, constitute an undue intrusion into the jury's province and dilute the requirement of unanimity." *Id.*

The remarks that Bell takes issue with occurred at 8:44 p.m. and are set out in context:

> THE COURT: All right. Ladies and Gentlemen, I called you back into court because you've been in deliberations now eight and a half hours. Actually, eight hours and forty-five minutes. Apparently, you are having difficulty reaching a decision. I don't want to know how you're

divided, but I need to know if you are, in fact, divided.

Who is the foreman of the Jury? You are, Mr. [Juror]?

[JUROR]: Yes, sir.

THE COURT: Okay. And the Jury is divided, I take it?

[JUROR]: Yes, sir.

THE COURT: Okay. Mr. Foreman, is there any probability that the Jury will come to an agreement?

[JUROR]: Tonight, your Honor? Not tonight. We have come to an agreement on one count. The other three, we're still—still hammering out. (Long pause.)

THE COURT: Ladies and Gentlemen, once a case has been submitted to the Jury, the Jury cannot separate. That means that you can't go home unless you reach a verdict or unless you are discharged. There have been no accommodations made for overnight—for an overnight stay for the Jury. No sleeping accommodations have been arranged for you. (Pause.)

I tell you that, Mr. Foreman, because your answer to my question—(pause)—was that you'd—when I asked you if there was any probability of you agreeing, you answered not tonight.

[JUROR]: If you could shed some light on some issues, it would be possible.

THE COURT: Pardon?

[JUROR]: If you could shed some light on some issues, it would be possible to come to an agreement on a verdict. (Pause.)

The judge then asked the jury to write its question down, stating:

Okay. And we'll try to answer it. Now, I do not intend to tell the Clerk or the Bailiffs to start finding motel rooms. I do not intend to tell the Clerk or the Bailiffs to find more Bailiffs to stand guard over you folks while you are in the motel room.

Those arrangements were not made because I don't think that anybody in this lawsuit thought that it would require overnight accommodations before the Jury could reach a verdict in this case and so none of those arrangements were made.

And, you know, I've only had a couple of cases in eighteen years on the bench where we made overnight accommodations for a jury. In both of those cases, that was after several weeks of trial. So I just want you folks to know that.

Put it in writing. We'll try to answer it. But if you're not going to resolve this case, I'm not going to keep you up all night. I'm not going to keep you away from home all night.

Now, I'm not threatening you. I'm not trying to put any pressure on you. I'm just trying to make you understand that—that there will come a point this evening when enough is enough.

All right. Take them out.

The jury did write down its question which the judge answered:

As a result of the discussions that the Court had with the Jury, the Jury has sent the following written note to the Court. It reads as follows: "Instruction No. 16, Part No. 7, what is the definition of 'intended to commit a criminal offense'? What is the definition of 'intent'?"

In response, the Court has taken the Black's Law Dictionary ... and abstracted the following definitions and instructions: "intent," hyphen, "design, resolve, or determination with which a person acts. A state of mind in which a person seeks to accomplish a given result through a course of action."

"Intend. To design, resolve, propose. To plan for and expect a certain result. Commit. To perpetrate, as a crime."

"If a person intended to commit a criminal offense, then that person planned for and expected to perpetrate a crime, one, against another person; or, two, with another person."

The jury was given this explanation at approximately 9:50 p.m., and it returned with a verdict at 11:18 p.m.

Bell contends that the judge's comments that no overnight accommodations had been made indicated that he was unduly anxious to conclude the case, pressured the jury to deliberate for an unreasonable length of time,

and coerced it into coming to a final decision. The state counters that the judge was merely trying to assure the jurors that he was neither going to keep them deliberating all night nor going to sequester them away from their families when he instructed them that, if they could not come to a decision soon, he was prepared to discharge them from their duty.

■ We agree that, if we consider only the isolated comments that Bell plucked out of the judge's discourse, it would appear that the judge was pressuring the jury to come to a decision. When viewed in context, however, it is clear that the judge was merely informing the jury that he was not going to require it to deliberate much longer. Indeed, he even emphasized that he was not trying to pressure it into reaching a verdict. Furthermore, we are not convinced that the jury deliberated for an unreasonable amount of time. In fact, that appears to be precisely what the judge was trying to prevent when he interrupted the deliberating jury.

Bell also claims that the judge should have given an "Allen" instruction to temper his comments and to remind the jurors that the verdict must reflect the views of them all. He points to the quickness that the jury returned with its verdict after the comments from the judge to support his argument that the judge's comments pried some jurors loose from their strongly held beliefs. The state responds that the jury instructions adequately conveyed that the "verdict must express the individual opinion of each juror"; "[i]n the course of your deliberation, do not hesitate to re-examine your own views [which] does not mean that any juror is required to yield an honest conviction after consultation and deliberation"; and "[y]ou should weigh all the evidence in the case and if you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty."

We agree that the instructions adequately covered the directive to the jurors that they must stand firm on their honestly held convictions and that they must vote in accordance with them. We conclude that, when viewed in context, the judge's remarks did not "possess the substantial propensity of prying minority jurors loose from beliefs they honestly ha[d], constitute an undue intrusion into the jury's province [or] dilute the requirement of unanimity." *Smith,* 564 P.2d at 1201.

■ Bell also complains about the response that the judge gave to the jury's question. He criticizes the last sentence: "[I]f a person intended to commit a criminal offense, then that person planned for and expected to perpetrate a crime, one, against another person; or, two, with another person." He claims that this sentence too closely mirrored the elements of two of the charges the state had to prove that, if the victim left with Bell of her own volition, "the Defendant intended to commit a criminal offense with or against her." Bell asserts that this sentence unduly intruded into the province of the jury because it conveyed the suggestion that the judge had concluded that Bell "planned for and expected to perpetrate a crime, one, against [the victim], or, two, with [her]." He also contends that this diluted the unanimity requirement because the judge substituted his own opinion for that of each individual juror. We disagree.

Despite Bell's convoluted attempt at providing an argument to support this proposition, we simply cannot fathom how Bell believes the sentence at issue conveyed the suggestion that the judge had concluded that Bell had planned for and expected to perpetrate a crime against or with the victim. The language of the sentence is phrased in as unbiased fashion as possible. If the jurors believed the intent element was present, they would vote to convict; if they found that the intent element was lacking, they would vote to acquit. Nothing within the definition suggested to the jury what its decision should have been, and we decline to find error in its submission to the jury.

## III. Denial of Bell's Motion to Sever

Bell next asserts that the trial court erroneously denied his motion to sever the sexual assault charges from the custodial interference charges. He claims that, as a result of the improper joinder, he was unable to raise an affirmative defense available by statute to

the custodial interference charges because doing so would have opened the door to other bad acts evidence which would prejudice the jury on the sexual assault charges.

 W.R.Cr.P. 14 provides that a court may allow separate trials of charges if it appears that either the defendant or the state is prejudiced by joinder of the offenses. Given the discretionary nature of the rule, the decision not to separate the charges " 'will be reviewed under our traditional abuse-of-discretion standards.' " *Black v. State,* 869 P.2d 1137, 1139 (Wyo.1994) (quoting *Ostrowski v. State,* 665 P.2d 471, 484 (Wyo.1983)). A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. *Bruckner v. State,* 972 P.2d 141, 142 (Wyo.1999).

 W.R.Cr.P. 8(a) governs the joining of charges:

(a) Joinder of Offenses. Two or more offenses may be charged in the same citation, indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction, or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Joinder is proper absent compelling reasons for severance. *Bishop v. State,* 687 P.2d 242, 247 (Wyo.1984), *cert. denied,* 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985). "Joint trials serve the public interest by expediting the administration of justice, reducing docket congestion, conserving judicial time as well as that of jurors along with avoiding the recall of witnesses to duplicate their performances." *Jasch v. State,* 563 P.2d 1327, 1335 (Wyo.1977).

 Bell contends that the charges were improperly joined because they were not based on the same act or transaction nor part of a common scheme or plan as required by W.R.Cr.P. 8(a). He maintains that the events underlying the various charges occurred over the span of about a week and that they were distinct in time and place and had nothing to do with one another. The state argues that the acts alleged in all four counts did involve a common scheme or course of conduct: to have continuing sexual relations with the victim. We agree with the state.

Bell was engaged in a sexual relationship with the victim. That relationship very quickly intensified to the point where Bell helped the victim run away from home and then obstructed her safe return. Bell's plan, scheme, or course of conduct was obviously to continue his relationship with the victim, and the fact that the separate charges span a few days does not concern us. The offenses were similar in character and so related as to constitute parts of a common scheme or plan as contemplated by W.R.Cr.P. 8(a).

 Bell insists that, even if the counts were properly joined under W.R.Cr.P. 8(a), the trials should have been separated under W.R.Cr.P. 14 because of the prejudicial risks a single trial posed to him. He claims that he was prejudiced because he was unable to avail himself of the affirmative defense to the custodial interference charges that the victim left or did not return at her own instigation and that he lacked the necessary intent to commit a criminal offense with or against a child. Wyo. Stat. Ann. § 6–2–204 (LEXIS 1999). He argues that he was not able to assert this affirmative defense because, if he had, the state would have been able to present evidence that he had engaged in sexual relations with the victim while they were in Utah as rebuttal evidence which would not have been admissible in a trial on just the sexual assault charges. The state points out that this claim must be analyzed by balancing the potential prejudice against the judicial economies created by the joinder. *Dorador v. State,* 768 P.2d 1049, 1052 (Wyo.1989); *Lee v. State,* 653 P.2d 1388, 1390 (Wyo.1982).

This Court considers two factors in balancing these competing factors to determine whether the joinder improperly prejudiced a defendant:

The first is whether the evidence relating to the similar offenses charged would be admissible in a separate trial of each offense. If the evidence would be admissible, there is no prejudice. If the evidence

would not be admissible in separate trials, the trial court should then determine whether the evidence of each crime is "simple and distinct." *Drew v. United States,* 331 F.2d 85, 91 (D.C.Cir.1964). Stated differently, the second consideration is whether the evidence relating to the separate offenses would be so complicated that the jury could not reasonably be expected to separate them and evaluate the evidence properly and individually on each separate charge.

*Dorador,* 768 P.2d at 1052 (citation omitted).

Bell offers the bold and unsupported assertion that the evidence regarding the sexual relationship that existed while the couple was in Utah would not have been admissible in a trial on the sexual assault charges because it would create the improper inference that he had a propensity to have sexual relations with the victim. Without stepping on the trial court's discretionary powers, we do not agree with Bell that the Utah evidence would necessarily be inadmissible in a trial on just the sexual assault charges.

This Court has previously held that, "in the context of sexual offenses[,] other similar acts may be admitted if they involved the victim in the charged offense." *Elliott v. State,* 600 P.2d 1044, 1047 (Wyo.1979). Additionally, in cases involving sexual abuse of minors, this Court "has generally sustained convictions where evidence of uncharged misconduct was admitted under W.R.E. 404(b) to demonstrate a relevant course of conduct between the perpetrator and the victim or to show the motive of the perpetrator for committing the action questioned." *Jackson v. State,* 891 P.2d 70, 75 (Wyo.1995).

Even if the trial court found in its discretion the evidence inadmissible, the case was simple and uncomplicated. We are not concerned that the case was so "complicated that the jury could not reasonably be expected to separate [the charges] and evaluate the evidence properly and individually on each separate charge." *Dorador,* 768 P.2d at 1052. We must assume that the jury followed the trial court's instruction that "[e]ach count, and the evidence pertaining to it, should be considered separately by the jury." *Dobbins v. State,* 483 P.2d 255, 259 (Wyo.1971).

## IV. Other Bad Acts Evidence

Bell next claims that the trial court improperly admitted evidence of Bell's other bad acts in the sexual assault/custodial interference case. The state argues that the evidence regarding Bell's sexual advances toward the victim's fourteen-year-old friend was probative of Bell's motivation to have sex with underage girls.

The trial court held a pretrial hearing wherein it considered the admissibility of this evidence. The trial court found that the evidence was relevant and that its probative value outweighed the danger of unfair prejudice but reserved its ruling until the trial. At trial, the victim's friend testified that she stopped working for Bell because she suffered an injury and because he "was making sexual comments and sexual suggestions and stuff towards [her]." The prosecutor asked, "Larry Bell was?" and the victim answered, "Yes." Defense counsel then objected. The trial court overruled the objection, but no further testimony on the matter was elicited.

Bell contends that the trial court failed to follow the correct procedure for admitting other bad acts evidence. W.R.E. 404(b) governs the admissibility of other bad acts evidence:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In *Rigler v. State,* 941 P.2d 734, 736 (Wyo.1997), this Court considered the argument that the trial court failed to follow the correct procedure by neglecting to articulate its reasons for finding that the probative value of the evidence outweighed the prejudicial effect of such evidence. We held that the trial court's finding that, "although the evidence was obviously prejudicial to Appellant, it was not unfairly prejudicial and that the probative value of the evidence outweighed the danger of unfair prejudice" was

sufficient. *Rigler*, 941 P.2d at 738. We find this holding appropriate in the case at bar. We also emphasize that, in this case, the trial court reserved its ruling until the time of trial and that the defense failed to make a timely triggering objection.

■ Bell argues that the testimony was not relevant because his motivation was not at issue. The state points out that Bell's defense to the sexual assault charges was that he did not know the victim's age, suggesting that he was motivated only by acceptable sexual desires for a woman capable of legally consenting. We agree with the state. His motive was relevant, and the evidence was admissible for that reason.

Bell also asserts that the purpose for which the evidence was offered was improper, insisting that, although the state claims it was offered to prove motive, it actually only suggests the impermissible inference that Bell had the propensity to act in a particular fashion. We disagree. The evidence displayed a motive by demonstrating a common style of misconduct to achieve sexual gratification and showed that Bell was not concerned about the age of his sexual partners.

Bell next asserts a confusing argument about how the evidence from the victim's friend was unduly prejudicial because of the victim's inability to remember the exact dates the sexual encounters occurred. We are at a loss to see the connection Bell attempts to make by asserting this argument. Suffice it to say that we disagree.

**V. Duplicative Custodial Interference Charges & Sentences**

In Bell's final claim of error, he asserts that the trial court violated his constitutional right against double jeopardy when it refused to dismiss the second custodial interference charge. The state counters that Bell did not raise this argument to the trial court and that it, therefore, should not be considered by this Court.

■ We generally will not consider issues which are raised for the first time on appeal unless they are jurisdictional issues or issues of such a fundamental nature that they must be considered. *WW Enterprises, Inc.*

*v. City of Cheyenne*, 956 P.2d 353, 356 (Wyo. 1998). A criminal defendant waives the defense of double jeopardy if he does not present a double jeopardy argument to the trial court. *Yetter v. State*, 987 P.2d 666, 670 (Wyo.1999). We, therefore, are unable to decide the merits of this claim.

Affirmed.