2004 WY 91

**Floyd STRICKLAND, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 01–196.

Supreme Court of Wyoming.

July 30, 2004.

Representing Appellant: Initial Brief and First Supplemental Brief: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel, Cheyenne, Wyoming.* Second Supplemental Brief: Jason M. Tangeman of Anthony, Nicholas, Tangeman & Yates, LLC, Laramie, Wyoming. Oral argument by Mr. Tangeman.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Theodore E. Lauer, Director, and Timothy William Jones, Student Intern, of the Prosecution Assistance Program, Cheyenne, Wyoming. Argument by Mr. Jones.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] Appellant, Floyd Strickland (Strickland), was convicted of both first degree ar-

* Public Defender's Office allowed to withdraw on March 27, 2003.

son[1] and second degree arson,[2] for feloniously setting fire to his home with the intent to collect the insurance proceeds. Concurrent sentences of 120 months to 216 months, and 60 months to 108 months were imposed. Strickland seeks review of those convictions, raising more than a dozen issues. We will affirm the judgment of convictions, but remand with directions that the district court either delete, or flesh out, a provision in the sentence that essentially bans Strickland from Natrona County if he is placed on parole or other limited release.

## ISSUES

[¶ 2] We summarize the issues raised by Strickland in his initial brief:

I. Whether there was sufficient evidence to convict Strickland of first-degree arson?

II. Did Strickland's counsel fail to provide effective assistance of counsel by not calling an expert witness to testify at trial, or by not submitting jury instructions on alibi or specific intent?

III. Did omission of the words "towards another" in the jury instruction defining "maliciously" constitute error?

IV. Did the district court sufficiently instruct the jury on the specific intent element of both first-degree arson and second-degree arson?

V. Did the district court err when it did not appoint substitute counsel for Strickland?

VI. Did the district court err when it denied Strickland's motion to suppress evidence?

VII. Did the district court err when it admitted into evidence the written report of arson investigator Harry Morrow?

VIII. In sentencing Strickland, did the district court unlawfully banish him from Natrona County?

IX. Was cumulative error committed?

X. Was Strickland's right against double jeopardy violated when he was convicted and sentenced for both first-degree arson and second-degree arson?

In a supplemental brief, Strickland expanded on the last issue listed above:

XI. Whether Strickland's convictions for first-degree arson and second-degree arson cannot stand because the two crimes are mutually exclusive and punishment for both crimes violates Strickland's right to be free from double jeopardy?

In a second supplemental brief, Strickland raised these additional issues:

XII. Whether the State of Wyoming's repeated introduction of impermissible 404(b) evidence and other conduct constituted prosecutorial misconduct and such misconduct prejudiced a substantial right of [Strickland] and denied his right to a fair trial?

XIII. Whether in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance and prejudiced [Strickland] so that the adversarial process was compromised and the trial did not reach a just result?

The State essentially conforms its statement of the issues to that offered by Strickland. The State does contend that with respect to

---

1. **§ 6–3–101. Arson; first degree; aggravated arson; penalties.**

 (a) A person is guilty of first-degree arson if he maliciously starts a fire or causes an explosion with intent to destroy or damage an occupied structure.

 (b) First-degree arson is a felony punishable by:

 (i) Imprisonment for not more than twenty (20) years;

 (ii) A fine of not more than the greater of twenty thousand dollars ($20,000.00) or two (2) times the face amount of the insurance if the fire was started to cause collection of insurance for the loss; or

 (iii) Both fine and imprisonment.

Strickland was sentenced to 120 to 216 months in prison for this conviction.

2. **§ 6–3–102. Arson; second degree; penalties.**

 (a) A person is guilty of second-degree arson if he starts a fire or causes an explosion with intent to destroy or damage any property to cause collection of insurance for the loss.

 (b) Second-degree arson is a felony punishable by imprisonment for not more than ten (10) years, a fine of not more than two (2) times the face amount of the insurance, or both.

Strickland was sentenced to 60 to 108 months in prison for this conviction, to be served concurrently with his first degree arson sentence.

several issues no objections were lodged below or the issue was not otherwise called to the attention of the trial court and, therefore, those issues must be addressed under the plain error standard.

## FACTS

[¶ 3] Strickland returned to Casper after a family vacation on Saturday, June 17, 2000, and discovered that his home had been damaged by fire during his absence. Police Officer Richard Brown was dispatched in response to Strickland's 911 telephone call. Strickland told Officer Brown he had already looked inside the house and could hear water running and smell a burning odor. Officer Brown testified that, in response to a question about the cause of the fire, Strickland related that he had filed a lawsuit and had alienated a number of people. However, Strickland also indicated that the cause could have been a broken water pipe because the house was in bad shape. When Strickland informed Officer Brown that he had found a door into the garage unlocked and partially open, Officer Brown examined the door knob and the door frame closely and carefully, using his flashlight, and did not observe any latent finger prints or indications that it had been pried open. However, a few days later a fellow police officer showed Officer Brown a piece of the door frame that he had taken from the scene on June 18, and it had what appeared to be fresh pry marks on it. Officer Brown was certain that had the marks been there the night he was there, he would have noticed them, because that is precisely what he was looking for. Strickland told Officer Brown that all the doors to his home were secured when he left, that he was the last person out of the house, and that no one else had a key. Strickland also directed Officer Brown's attention to a sliding glass door to the kitchen that was ajar, but Officer Brown did not detect any signs that the door had been forced open. Strickland told Officer Brown that nothing was missing from the house, but that the contents of the basement, where most of the damage from fire and running water occurred, were worth over $30,000. Officer Brown did not smell smoke in the house, though Strickland pointed out soot on the walls in the kitchen to him.

[¶ 4] The electricity to the house was still on, and there was water running from a broken pipe in the basement, so Officer Brown called the service providers and had them shut off the power and water. Officer Brown waited at the house for the utilities to be shut off, and Strickland left with his family to go to a motel. Officer Brown told Strickland that an evidence technician would be there the following day to continue the investigation. Although Officer Brown made no determination of the cause of the fire that night, he related that Strickland knew that criminal activity was possibly involved and that an investigation into it would continue.

[¶ 5] Police Officer Michael Concepcion is the evidence technician who was assigned to further investigate Strickland's report of the fire in his home. He arrived at the scene about 6:00 p.m. on June 18, and Strickland unlocked the front door and admitted him into the home. Strickland directed Officer Concepcion's attention to a garage door that had pry marks on it as well as a screwdriver that Strickland said did not belong to him. Officer Concepcion testified the pry marks appeared to have been made recently. Strickland told Officer Concepcion that he had pointed out the pry marks and the screwdriver to Officer Brown.[3] The doorjamb itself was cut out and preserved as evidence. Officer Concepcion opined that the pry marks on the doorjamb could have been made by the screwdriver Strickland identified as not belonging to him. Officer Concepcion also noticed a plastic gas can near the door from the garage into the residence. The gas can was open and the air valve on the back was raised. Officer Concepcion then continued his portion of the investigation by taking photographs throughout the house. When asked about suspects, Strickland identified the previous owner of the house and some real estate agents as possible suspects. Strickland also made a written list of those suspects as follows:

---

**3.** In later testimony, Officer Concepcion related that he discussed the pry marks and the screwdriver with Officer Brown, and Officer Brown said Strickland had said nothing about them to him and that he did not observe the pry marks.

Roger and Fred Stratton; Victoria M. Lowe; Harry Willis; Michael K. Ward; Sandra Erickson; and John Logan. Officer Concepcion found footprints in the soot on the kitchen floor. Strickland thought they were probably made by him or Officer Brown. The final part of Officer Concepcion's work was done in the basement of the house, and after he observed and photographed that area, he called his supervisor to request that a fire inspector be sent to the scene. Strickland asked Officer Concepcion several times if he thought the fire was caused by arson. Officer Concepcion asked Strickland if anything was missing from the house, and Strickland replied that nothing was missing, but that he takes his personal belongings with him on vacation. Officer Concepcion noticed the house was kind of "sparse," not much hanging on the walls or on top of dressers.

[¶ 6] Harold Morrow, a trained and experienced fire/arson investigator, was dispatched to the Strickland residence late in the afternoon of June 18, 2000. Officer Concepcion was already at the scene, as was Strickland. Morrow obtained permission from Strickland to enter the home, and Officer Concepcion led Morrow to the basement. Morrow photographed the fire scene and made a diagram of the entire basement. Morrow was able to identify the origin of the fire in a small utility closet where the water heater was located. Morrow took note that the water heater was an electric appliance, and although he had seen instances where gas water heaters had caused a fire, he had not seen that with electric ones. Because Morrow had less experience with a fire situation such as this one, he called in Fire Chief Rich Carpenter to continue the investigation. Morrow visited with Strickland while they waited for Carpenter to arrive. During that conversation Morrow became aware of Strickland's dispute over the house and the lawsuit with the previous owner and the realtor involved in the sale of the house. He also noticed pry marks on the garage door as Strickland showed him around.

[¶ 7] Not long after Carpenter arrived, he ascertained that the fire had been deliberately set. Morrow then brought in evidence cans and obtained a consent to search from Strickland. In the area of the water heater, beneath fire debris, Carpenter found partially burned newspaper, a metal food rack, candle drippings, a gasoline soaked magazine, and the presence of newspapers stuffed behind the water heater. In addition, the sheet rock wall behind the water heater had been punctured in three areas in what could have been an attempt to spread the fire through the fire resistant sheet rock and into the wall structure. It was also evident that the fire had become hot enough to melt a solder joint in a hot water line, causing a breach in that line. The escaping water had extinguished the fire. The water continued to build up in the basement until it reached the level of the toilet and bathtub, and after that it leveled off at about two feet as water drained out through the toilet and tub. A mass of candle wax that Carpenter believed was from the fire area had floated all the way to the bathroom and settled on the floor near the toilet. The candle appeared to have been one of significant size. The fire was actually caused by the lit candle, which burned down until it lit the fumes from the gasoline soaked magazine and ignited the newspaper. Morrow informed Strickland of the results of the investigation and that the evidence established that the fire was an arson. Strickland reacted calmly to that news. Had the fire not been extinguished by the broken water line, the fire had the potential to have destroyed the house.

[¶ 8] Derrick Dietz, a detective for the Casper Police Department, became involved in this matter on June 18, 2000, when he was called to the scene by Officer Concepcion. Immediately upon his arrival, and before any other words were exchanged, Strickland asked Officer Dietz if he was a suspect in the fire. Officer Dietz responded that he did not know. While Officer Dietz attempted to survey the scene, Strickland followed him around, to some extent interfering with his ability to investigate. In addition, Strickland volunteered a lot of information about the fact that he was away from home when the fire started, and that he had worked as a plumber and knew better than to start a fire near the water heater because he knew it would melt the water pipes and extinguish the fire. Officer Dietz also noticed that the

walls were sparsely decorated and things appeared to be missing from the walls and closets. In order to facilitate the investigation process, Officer Dietz asked Strickland to come to the police station and talk with him. Strickland met Officer Dietz at the police station about forty minutes later. He traveled there in his own car. When Officer Dietz confronted Strickland with the suspicious nature of the evidence the police were finding, Strickland became angry and left. Officer Dietz also reviewed an examination under oath given by Strickland, which served as a comparison with what the various police officers had testified to, pointing out some inconsistencies and inaccuracies in that examination.

[¶ 9] Officer Dietz also testified that he found out that Strickland had a business office in Casper. Officer Dietz obtained a search warrant for that office and conducted a search. A lot of personal possessions not associated with the business were found boxed up in the office. It was readily apparent that some of those things had been through the fire (were sooty, smelled of smoke), and some had not been through the fire. The items that had not been through the fire were family photographs and keepsakes, valuables, firearms, financial records, important pieces of mail that were addressed to the Strickland's home address prior to the fire, etc., that could have been stored there to prevent them from being destroyed in a fire.

[¶ 10] Strickland's home was insured by Allied Insurance. The policy covered the cost to replace/repair the home (which could include costs that exceeded the home's face value of about $159,500), as well as replacement contents coverage of $111,650. Strickland and his wife were the insureds and any recovery by them would have been barred if the damage had been intentionally caused by either one of them. However, the mortgage holder was also a beneficiary of the insurance policy, irrespective of the cause of the fire. A claim submitted to the insurance company by Strickland in 1999 was denied because the

damage, caused by settlement/earth movement, was not covered by the policy or was a preexisting problem with the home predating his policy. Strickland reported the fire damage that is the subject of this case to the insurance company on the morning of June 17, 2000. The insurance company completed a routine investigation of the claim, and it also hired an expert to conduct a "cause and origin" investigation of the fire. The insurance company made an initial payment of $2,500 to Strickland for living expenses on June 21, 2000. Eventually, Strickland submitted loss claims of about $140,000. After completing its investigation, the insurance company denied the claim and voided the policy. However, Wells Fargo, the mortgagor, was paid approximately $54,000 for the loss of its value in the house.

[¶ 11] Strickland's insurer retained David Harvey to conduct a cause and origin investigation of the fire. Harvey considered it unusual that Strickland's first reaction to his presence was to volunteer a detailed alibi of why he could not have set the fire. Strickland told Harvey that nothing about the house had changed, nothing had been brought in or taken out, except for things taken by the police and fire investigators. The only thing Strickland noted was that a can of Coleman camp fuel may have been missing from the garage.[4] Harvey's investigation detected that a considerable amount of stuff had been brought into the house after the fire, and that many things also appeared to have been removed prior to the fire. Harvey was afforded access to the evidence collected by the police, as well as having the results of his own investigation and testing. Harvey also concluded the fire was an arson.

[¶ 12] Sandra Erickson, the previous owner of Strickland's home, testified that she sold the house to Strickland for $110,000, and that he sued her because he alleged there were defects in the home that she had not disclosed. She denied knowledge of any defects and testified that the lawsuit against her had been dismissed prior to the fire.

---

**4.** Earlier testimony established that the accelerant for the fire was gasoline and not Coleman fuel.

She also denied possessing a key to the house, giving anyone else a key to the house, or having anything to do with the fire. The testimony of one of Strickland's neighbors suggested that, prior to the fire, he had compounded his problems with the value of the home by advertising it for sale for $475,000 and listing his grievances about the home's condition and the performance of the real estate agency. Fred Stratton testified that he sold the house at issue to Strickland, and Strickland had filed suit against his real estate firm, one of his agents, the home inspector, structural engineer, and the previous owner of the house. Stratton related that he offered to settle the suit for $10,000, which he thought was a fair amount to repair and paint what he viewed as "cosmetic" flaws in the foundation and walls of the house. Strickland wanted in excess of $100,000 to settle the suit. The lawsuit was eventually dismissed, and Stratton knew before the fire that it was going to be dismissed. Stratton denied having set the fire or knowing anyone that had anything to do with it. Harry Willis, a home inspector who inspected Strickland's home prior to his purchase, testified that Strickland sued him and that he was always confident he would be vindicated, and that he had done nothing wrong in the course of performing his inspection. He inspected the house a second time after Strickland complained. He did find some new cracking in walls but considered them to be "cosmetic." He also confirmed that the lawsuit against him was dismissed and that he had nothing to do with the fire.

[¶ 13] Strickland testified in his own behalf, and cross-examination by the prosecutor revealed that he was having some financial problems prior to the fire as well as that he had provided false or inaccurate information on his application to become a real estate broker (that he had a college degree) and on a credit card application (that his real estate company had anticipated sales of one million dollars—in reality his fledgling company had no sales). Strickland also testified on cross-examination that he reported a couple of backpacks and a sleeping bag as missing

from his basement, and that in the backpacks were camp candles designed to be "ten-hour candles."

[¶ 14] On January 11, 2001, an information was filed in the Circuit Court of the Seventh Judicial District charging Strickland with one count of first degree arson and one count of second degree arson.[5]

## DISCUSSION

### Insufficient Evidence of Malice; Failure to Instruct on Malice; Specific Intent

■ [¶ 15] On August 18, 2003, Strickland submitted supplemental authorities, conceding that our decision in *Keats v. State*, 2003 WY 19, ¶¶ 7–33, 64 P.3d 104, ¶¶ 7–33 (Wyo.2003), is dispositive of issues I, III, and IV, as set out by Strickland. We agree with this concession. We will not repeat all that is said in *Keats*, as it is a fairly comprehensive discussion of the subject matters covered by those issues. It suffices here to note that we held that first-degree arson is a specific intent crime and that an instruction which sets out all the elements of that crime, including that portion describing that the fire be set "with intent to destroy or damage an occupied structure," fulfills the need to instruct on specific intent. In this case, just such an instruction was given and, as *Keats* concludes, it is not error, indeed it is the better practice, for the trial court to refuse an offered instruction further defining "specific intent." In *Keats*, we also approved a "malice" instruction virtually identical to the one given here. Further, we held that "malice" is not limited to ill will directed at another person, but rather may encompass any criminal act that is done deliberately and without justification. *Keats* also makes clear that the evidence admitted in Strickland's trial was sufficient to sustain the jury's conclusion that he acted with "malice" in setting the fire in his home.

### Ineffective Assistance of Counsel

[¶ 16] Strickland raised two separate ineffective assistance of counsel issues. They

---

5. We will not set out in detail the many causes of delay in this case; however, we observe that the final brief was not filed until June 9, 2003. By order entered on July 1, 2003, the case was set for argument, and the case was heard and taken under advisement on August 21, 2003.

are those numbered II and XIII of the issues raised by Strickland. In the first of these, he contends his counsel was ineffective in failing to engage the services of an expert witness to counter the testimony of the State's three expert fire investigators (two Casper Fire Department employees and the expert hired by Allied insurance). He enlarges on that, contending that as a whole his counsel were ineffective in defending him against the arson charges.

[¶ 17] The standard of review to be applied here is well defined:

> We recently reaffirmed our standard for reviewing claims of ineffective assistance of counsel in *Becker v. State*, 2002 WY 126, ¶ 12, 53 P.3d 94, ¶ 12 (Wyo.2002), and *Chapman v. State*, 2001 WY 25, ¶ 6, 18 P.3d 1164, ¶ 6 (Wyo.2001). Those cases approve the standard articulated in *Jackson v. State*, 902 P.2d 1292, 1295 (Wyo. 1995), and applied in *Grainey v. State*, 997 P.2d 1035, 1038–39 (Wyo.2000):
>
> > When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo. 1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo.1995) [overruled on other grounds, *Jones v. State*, 902 P.2d 686 (Wyo.1995)]; *Arner v. State*, 872 P.2d 100, 104 (Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796; *Starr*, at 1266; *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).
> >
> > Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo.1986); *Frias*, 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to "render such assistance as would have been offered by a reasonably competent attorney" and that "counsel's deficiency prejudiced the defense of the case." *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.
> >
> > The burden of proving that counsel was ineffective therefore rests entirely on the Appellant. *Sorensen v. State*, 6 P.3d 657, 660 (Wyo.2000), *cert. denied*, 531 U.S. 1093, 121 S.Ct. 818, 148 L.Ed.2d 702 (2001).

*Barkell v. State*, 2002 WY 153, ¶¶ 9–10, 55 P.3d 1239, ¶¶ 9–10 (Wyo.2002).

[¶ 18] With respect to counsel's failure to call an expert witness, we have held:

> In *McCoy v. State*, 886 P.2d 252, 256 (Wyo.1994), we recognized that failure to call an expert witness may constitute ineffective assistance of counsel. However, in *Bloomquist v. State*, 914 P.2d 812 (Wyo. 1996), we also stated that "the defendant must show that such expert testimony was available and necessary" and that "[a]ppellant must show that an expert was available who would have testified consistently with his theory." *Id.* at 820.

*Barkell*, at ¶ 16.

■ [¶ 19] In his brief, Strickland concedes that "[w]hile failure to secure an expert witness in this case is not sufficient in itself to find ineffective assistance of counsel, counsel's further failure to submit proper instructions confirms that counsel was ineffective." The instructions Strickland claims should have been offered were an alibi instruction and a theory of the case instruction, as well as a specific intent instruction. We

have already held above that the district court's instruction with respect to specific intent was proper. Our review of the record leaves no doubt that Strickland's "alibi" defense, if it can accurately be described as an "alibi" at all, was comprehensively presented to the jury and argued by counsel. The record is also abundantly clear that Strickland's theory of his case was comprehensively presented to the jury through multiple witnesses and vigorously argued by counsel. Defense counsel was not ineffective for failing to offer such instructions.

■ [¶ 20] The issue of whether defense counsel should have called an expert witness on the subject of the fire's "cause and origin" was first broached in conjunction with a bevy of pro se post trial motions that included a motion for new trial, a motion to appoint new counsel, and a motion to reconsider previous rulings on similar motions filed by Strickland's attorney. Strickland offered the affidavit of an "expert," Gerald L. Hurst, Ph.D. That affidavit disputed the testimony of the State's experts. In addition, Hurst offered an opinion that an expert was necessary in Strickland's case and that his availability was well known to defense counsel well before trial. Hurst also attested to the fact that he had made it known to defense counsel that he was willing to work pro bono and that he had sent a copy of his "CV" (curriculum vitae) to Strickland's attorney. However, that CV is not attached to the affidavit nor is it otherwise included in the record. We are unable to ascertain if Hurst really is an "expert," or if his testimony was "necessary," as that term is contemplated by the applicable case law. Strickland's presentation at the motion hearing indicated that defense counsel had consulted with experts but did not call one as a witness because "his testimony would not support my case." Strickland claimed he insisted that Dr. Hurst be called as a witness but defense counsel refused to do so. However, Strickland also related that defense counsel were told by Dr. Hurst that he "felt he would be a detriment to my case if he came to testify for me because he had testified in a trial in North Carolina for a distant cousin of mine...." This strongly suggests that the decision not to call an expert was a tactical one, and

defense counsel opted to rely on intense cross-examination of the State's experts, as well as the lack of evidence placing Strickland at the scene when the fire occurred (the exact time of the fire was never established except that it occurred sometime while Strickland was gone on vacation). We conclude that Strickland did not meet his burden of demonstrating that the failure to call an expert witness constituted ineffective assistance of counsel under these circumstances.

■ [¶ 21] In his second supplemental brief, Strickland contends that defense counsel's acts or omissions were outside the range of professionally competent assistance and prejudiced the defendant so that the adversarial process was compromised and the trial did not reach a just result. Strickland contends defense counsel conceded in closing argument that the fire at Strickland's house was an arson, but then diverged from that argument to emphasize that the expert testimony was contradictory, incomplete or was not supported by the facts and, hence, could not be relied on. Further, defense counsel did not object to the expert testimony of Mr. Morrow, even though he admitted he lacked experience in investigating a fire of this nature. In addition, defense counsel did not object to the admission of Morrow's hearsay written report. Next Strickland contends defense counsel did not object to the expert testimony of Mr. Carpenter when it was apparent that the purpose of his testimony was only to "blatantly bolster" Morrow's testimony. Strickland claims that Morrow's testimony never came under attack and, therefore, such vouching for his credibility was improper.

[¶ 22] In *Blumhagen v. State,* 11 P.3d 889, 894 (Wyo.2000), we held:

Generally, one witness may not testify as to another witness' credibility. *See, e.g., Newport* [*v. State* ], 983 P.2d [1213] at 1215 [(Wyo.1999)]; *Gayler* [*v. State* ], 957 P.2d [855] at 860 [(Wyo.1998)]. The purpose of this rule is to preserve the integrity of the jury process by protecting the jury's right to act as the final determiner of the credibility of the witnesses. *Gayler,* 957 P.2d at 860. We have stated, however, that a trial

court does not necessarily commit plain error when it allows testimony which illuminates some aspect of the case even though the testimony incidentally bolsters the credibility of another witness. *Id.; Curl v. State,* 898 P.2d 369, 374 (Wyo. 1995).

In *Barnes v. State,* 858 P.2d 522, 534 (Wyo. 1993), we held:

> Credibility of witnesses is always a question of fact for the trier of fact to determine. *La Vigne v. Commw.,* 353 S.W.2d 376, 378–79 (Ky.1962). Witness credibility is subjective and may be affected by personal appearance, the perception of others, credibility of other witnesses, the theory of the case, the theme of the case, the order of witnesses and the character of the jury. 81 Am.Jur.2d *Witnesses* § 1027, p. 840 *citing* Purver, Young, Davis, and Kerper, *The Trial Lawyer's Book: Preparing and Winning Cases* (1990), § 11.3.

> The credibility of a witness may be attacked by any party, including the party calling him.

W.R.E. 607. A corollary to the rule allowing a party to attack the credibility of a witness is to permit the opposing party to bolster that credibility. Thus it has been held that:

> Thus, the credibility of a witness does not have to have been the subject of attack before it can be bolstered as was traditionally required in past. *Biunno, [Current N.J. Rules of Evidence,* comment 4 to Evid.R. 20 (1990 Anno.)], at 263 (citing *State v. Parsons,* 83 N.J.Super. 430, 437, 200 A.2d 340 (App.Div. 1964)). The party calling a witness may thus attempt to support credibility through direct or redirect examination and through the introduction of extrinsic evidence. *Ibid.* (citing *State v. Johnson,* 216 N.J.Super. 588, 603, 524 A.2d 826 (App.Div.1987)). Expert testimony may now be used to support a witness' credibility.

*State v. Frost,* 242 N.J.Super. 601, 577 A.2d 1282, 1288 (1990). We note that credibility may be supported or attacked by evidence of character for truthfulness or untruthfulness and by specific instances of conduct only as provided in W.R.E. 608, but the restrictions therein do not apply to the effort to bolster credibility in this case.

[¶ 23] Strickland contends that Morrow's testimony was not challenged by expert testimony and defense counsel only challenged Morrow's conclusions "on a common sense approach." Continuing, Strickland asserts: "In light of the absence of an attack upon Mr. Morrow's credibility, an absence of a rebuttal expert, and the tepid cross-examination, any bolstering was improper and rose to the level of plain error in this matter." Strickland further contends that if there is any doubt that the above evidence was improper, then certainly it was improper to call a third expert witness, Mr. Harvey from Allied Insurance, who had been a co-employee of Morrow and Carpenter at the Casper Fire Department for twenty-three years, and who provided essentially identical testimony to that of the other experts.

[¶ 24] We note at the outset that defense counsel did not object on these bases during trial. Lest Strickland assert that that too constituted ineffective assistance of counsel, we hasten to add that there is no apparent basis for such an objection and the district court would not have abused its discretion in overruling any such objection. In *Mintun v. State,* 966 P.2d 954, 959 (Wyo.1998), we held:

> There is no rule limiting the number of witnesses a party may call on a particular fact or issue. W.R.E. 403 permits a trial court to exclude relevant evidence for "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This rule is to be used sparingly, because it excludes evidence which is concededly relevant and probative. *Towner v. State,* 685 P.2d 45, 49 (Wyo.1984).

> Kwasnoski's mathematical conclusions, consistent with Sergeant Kourbelas' theories, served to corroborate Sergeant Kourbelas' testimony. Corroborative evidence, however, is not needlessly cumulative evidence. *See Dallenbach v. State,* 562 P.2d 679, 682 (Wyo.1977). The testimony of Sergeant Kourbelas and Kwasnoski varies in that Sergeant Kourbelas was not able to perform the mathematical cal-

culations necessary to ensure that his theories were consistent with the laws of physics. Kwasnoski was able to perform these calculations, and did so using Sergeant Kourbelas' measurements. Sergeant Kourbelas and Kwasnoski enjoy different areas of expertise, and each presented testimony consistent with his area. Kwasnoski's testimony was not needlessly cumulative.

Nor did Kwasnoski improperly vouch for Sergeant Kourbelas' credibility. Mintun admits it was proper for Kwasnoski to use the sergeant's facts and figures to reach a conclusion, but cries foul because the conclusion reached was the same as Sergeant Kourbelas'. This argument is the product of Mintun's mistaken notion that it is improper for a party to call two expert witnesses whose opinions are the same. The argument is lacking in substance and completely without merit.

*Also see Winterholler v. Zolessi,* 989 P.2d 621, 628–29 (Wyo.1999).

[¶ 25] We conclude that it was not improper for the State to have called three expert witnesses. Our review of the record establishes that each expert supplemented and rounded-out the testimony of the others. There was some redundancy, but only to the extent that it was necessary to make each witness's testimony sensical and put it in the proper perspective. The State clearly established a proper foundation for the testimony of each expert and any objection based on foundation would have been imprudent, unnecessarily expending defense counsel's credibility and taxing the patience of the trial court. It is also clear from the transcript that the experts were not used to vouch for the credibility of the others. Defense counsel's closing argument was certainly proper and may well have been wise. He merely argued that though there was undoubtedly a fire set on purpose (arson), the evidence the State was able to collect and that the experts were able to examine did not establish beyond a reasonable doubt that Strickland was involved with the setting of that fire. We hold that Strickland's counsel were not ineffective.

## Failure of Trial Court to Appoint Different or Substitute Counsel

[¶ 26] For this argument we employ the following standard of review:

We review the refusal to appoint substitute counsel for an abuse of discretion:

"While a trial court has the power in its discretion to appoint substitute counsel, its refusal to do so is not error unless an abuse of discretion is shown. A factual showing of good cause for the appointment of substitute counsel is essential to the demonstration of an abuse of discretion, and good cause is to be found in incompetence, commitment to a position or an interest which would conflict with the furnishing of an effective defense to the accused, or other good reason to conclude that appointed counsel is unable to furnish effective assistance."

*Bell v. State,* 994 P.2d 947, 951 (Wyo.2000) (*quoting Irvin v. State,* 584 P.2d 1068, 1071 (Wyo.1978)). The Sixth Amendment does not guarantee a meaningful relationship with appointed counsel; the purpose of providing assistance of counsel is to ensure that criminal defendants receive a fair trial. *Bell,* 994 P.2d at 951. A defendant has no right to the appointed counsel of his choice nor to counsel who would blindly follow his instructions. *Vargas v. State,* 963 P.2d 984, 990 (Wyo.1998). In evaluating Sixth Amendment claims, " 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.' " *Bell,* 994 P.2d at 951–52 (*quoting Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). A court's own evaluation of counsel and the effect of any substitution upon the scheduled proceedings are proper considerations in addition to the reasons given for a defendant's dissatisfaction. *State v. Stenson,* 132 Wash.2d 668, 940 P.2d 1239, 1272 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998).

*Allen v. State,* 2002 WY 48, ¶ 27, 43 P.3d 551, ¶ 27 (Wyo.2002); *also see Stout v. State,* 2001 WY 114, ¶ 7, 35 P.3d 1198, ¶ 7 (Wyo.2001).

[¶ 27] The Public Defender's chief trial counsel, Wyatt Skaggs, one of the most experienced criminal defense attorneys in Wyoming, entered his appearance on Strickland's behalf on February 9, 2001. Because irreconcilable differences developed between client and counsel, Skaggs was permitted to withdraw by order entered on March 1, 2001. Eventually two other public defenders were appointed to represent Strickland. In a letter filed in the district court on May 31, 2001, Strickland explained why the attorney/client relationship had failed with Mr. Skaggs, and why he felt his new attorneys were "incompetent, ineffective and/or negligent" in their representation of him. A principal concern was the failure of his counsel to obtain the services of an expert witness. The district court responded to that letter, explaining that any such request must be in the form of a motion and urging Strickland to confer with his counsel in that regard. Defense counsel broached the subject with the district court on June 6, 2001, at the hearing on Strickland's motion to suppress (the trial commenced on June 18, 2001). The district court limited his comments to urging communication and cooperation between client and counsel, and again indicating that any concerns needed to be brought by motion. The matter was not further called to the trial court's attention in the form of a motion until July 2, 2001, after Strickland's trial was complete. At that time he asked that new counsel be appointed to represent him in filing a motion for new trial.

[¶ 28] Our holding in *Allen*, at ¶ 32, is dispositive of this issue:

A district court has a duty to make some formal inquiry into, or engage the defendant in a colloquy regarding, the defendant's reasons for dissatisfaction with his appointed counsel when substitution of counsel is requested. *United States v. Anderson*, 189 F.3d 1201, 1210 (10th Cir. 1999) (*quoting Johnson v. Gibson*, 169 F.3d 1239, 1254 (10th Cir.), *cert. denied*, 528 U.S. 972, 120 S.Ct. 415, 145 L.Ed.2d 324 (1999)); *United States v. Graham*, 91 F.3d 213, 221 (D.C.Cir.1996), *cert. denied*, 519 U.S. 1136, 117 S.Ct. 1003, 136 L.Ed.2d 882 (1997). Such an inquiry not only helps the defendant (especially when the request is pro se) "adequately to express the reason for his dissatisfaction with counsel, thereby promoting confidence in the integrity of the process and in the jury's verdict," but also "creates an opportunity for the court to ease the defendant's concern if it is ill-founded. . . ." *Graham*, 91 F.3d at 221. However, even if appellant demonstrates that the district court did not properly address his motions to substitute counsel, he must demonstrate that the error was prejudicial to his case (i.e., that he was not afforded effective representation as guaranteed by the Sixth Amendment). *Graham*, 91 F.3d at 221. This Court having found that appellant's defense counsel was not ineffective, appellant has not met his burden on this issue.

Clearly it would have been the better practice for the district court to have reserved a few extra minutes to hear anything additional Strickland had to say, beyond what was in his letter, and to have treated his letter as a motion for substitute or new counsel. Indeed, there will be circumstances where such a hearing is mandatory and identifying those circumstances at the time such an issue arises can be difficult. A few minutes at a hearing could be a very valuable asset to affirming a case such as this on appeal. However, we have exhaustively reviewed this record and can only conclude that Strickland's counsel were not ineffective, indeed, they performed their function quite well. The district court did not abuse its discretion in not appointing substitute counsel under the circumstances of this case.

**Error in Denying Motion to Suppress**

[¶ 29] In analyzing this issue we employ this standard of review:

Generally, we do not disturb a trial court's evidentiary rulings unless the court has clearly abused its discretion. *Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994). "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.

1998). We give deference to the trial court's findings of fact on a motion to suppress unless they are clearly erroneous, recognizing that court has had the opportunity to assess the credibility of witnesses, weigh the evidence and make the necessary inferences, deductions and conclusions. *Jones v. State*, 902 P.2d 686, 690 (Wyo.1995) (citing *Wilson*, 874 P.2d at 218). Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law that we review de novo. *Wilson*, at 218. *Eckenrod v. State*, 2003 WY 51, ¶ 11, 67 P.3d 635, ¶ 11 (Wyo.2003).

[¶ 30] Strickland maintains that we must apply a decision of the United States Supreme Court to the resolution of this issue. In *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), a plurality of the Court held that, absent consent or exigent circumstances, administrative searches into the cause and origin of a fire are subject to the warrant requirement of the Fourth Amendment. *Id.* at 291–92, 104 S.Ct. at 646; *see also Michigan v. Tyler*, 436 U.S. 499, 504–05, 98 S.Ct. 1942, 1947, 56 L.Ed.2d 486 (1978). *Clifford* is not applicable here because the record is very clear that not only did Strickland suspect that the fire was arson himself, he encouraged and facilitated the investigation of the fire, and consented to all the searches which produced incriminating evidence. Applying the standard of review set out above, the district court's decision to deny the motion to suppress was not clearly erroneous, nor did the district court abuse its discretion.

### Error in Admission of Fire Investigator's Report

[¶ 31] Mr. Morrow, one of the fire investigators, prepared a written report of his cause and origin inquiry. The State sought its admission in evidence, and the district court admitted it over Strickland's objection.

[¶ 32] Rulings on the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a clear abuse of discretion. We will not overturn a trial court's discretionary decision unless the court acted in a manner exceeding the bounds of reason and could not rationally conclude as it did. Decisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal. *Robinson v. State*, 11 P.3d 361, 367 (Wyo.2000).

[¶ 33] Strickland contends that admission of that report violated W.R.E. 803(8)(B). The primary premise of that rule is that the listed items are not excluded by the hearsay rule, even though the declarant is available as a witness:

(8) *Public records and reports.*—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, **excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel,** or (C) in civil actions and proceedings and against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

W.R.E. 803(8)(B) (emphasis added). Strickland contends that Morrow was an "other law enforcement personnel" under the circumstances presented here and, therefore, the report was inadmissible. This matter was not clearly enough developed below for us to conclude dispositively that the report at issue was admissible or inadmissible. Professor Michael H. Graham's discussion of the issue suggests that the report was not admissible:

Records in any form setting forth matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel are admissible as a hearsay exception under Rule 803(8)(B). The exclusion in Rule 803(8)(B) applies to observations made by

police officers and other law enforcement personnel made at the scene of the crime, at the apprehension of the accused, or otherwise in connection with an investigation and not to records of routine, ministerial, objective nonevaluative matters made in nonadversarial settings.

The reason for this exclusion is that observations by police officers at the scene of the crime or the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases. The limitation applies only to a public record or report offered by the prosecution in a criminal case; thus public records or reports containing statements of matters observed first-hand pursuant to duty imposed by law as to which there was a duty to report are admissible when offered by the criminal defendant.

30B Michael H. Graham, *Federal Practice and Procedure: Evidence* § 7049, at 480–88 (Interim ed.2000) (footnotes and quotation marks omitted).

[¶ 34] Wyo. Stat. Ann. § 35–9–109 (LexisNexis 2001) (amended 2003) provides:

§ 35–9–109. Investigation of fires; notification to fire marshal; powers of fire marshal.

(a) The county fire warden or chief of the fire department of a city, town, or fire district shall investigate the cause, origin and circumstances of each fire occurring in the city, town, or district by which property has been destroyed or damaged in excess of five hundred dollars ($500.00). The investigation shall be commenced within two (2) days. The state fire marshal may direct the investigation.

(b) The officer investigating a fire shall notify the state fire marshal and within one (1) week of the fire shall furnish him a written statement of all facts relating to its cause and origin, and other information required by forms provided by the state fire marshal.

(c) The state fire marshal may investigate the origin or circumstances of any fire or explosion or any attempt to cause a fire or explosion.

(d) In performing the duties imposed by this act [§§ 35–9–101 through 35–9–130], the state fire marshal may:

(i) Enter and examine any building or premises where any fires or attempt to cause fires occurred;

(ii) Enter any building adjacent to that in which a fire or attempt to cause a fire occurred; and

(iii) Take full control and custody of the buildings and premises until his examination and investigations are completed.

Wyo. Stat. Ann. § 6–1–104(a)(vi)(E) (LexisNexis 2003) provides: "(vi) "Peace officer" includes the following officers assigned to duty in the state of Wyoming: ... (E) Any duly authorized arson investigator employed by the state fire marshal."

[¶ 35] It appears that the report should not have been admitted, but because of the lack of development of this issue below and rather cursory briefing in this appeal, we decline to definitively answer the question of whether Mr. Morrow was a law enforcement personnel under the circumstances of this case. Of this we are certain, W.R.A.P. 9.04 and W.R.Cr.P. 52(a) mandate that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded" by the reviewing court. Assuming for purposes of argument that the district court erred in admitting the report as evidence, we conclude that the error was harmless. The focal point of the testimony in this case was the evidence gathered by the fire investigators. Mr. Morrow as well as Mr. Carpenter gave detailed testimony on direct examination, and the cross-examination was equally as detailed. The testimony was not complicated, and the report was relatively brief. The error, if any, was harmless, and Strickland has failed in his burden to persuade us that it was prejudicial under the circumstances of this case.

**Did the District Court Banish (Sundown) Strickland from Natrona County**

[¶ 36] This issue arises because of this comment from the district court at sentencing: "I would ask the order also re-

flect, if it would, [Prosecutor], that if [Strickland] is released on parole or [i]n any other manner prior to his full service of the sentence imposed here, that the Court requests and recommends that he not be allowed to return to Natrona County, Wyoming." The recommendation is memorialized in the Judgment and Sentence. Strickland contends such a recommendation constitutes an illegal sentence and illegal sentences are, of course, prohibited. An illegal sentence is one that exceeds statutory limits, imposes multiple terms of punishment for the same offense, or otherwise violates constitutions or the law. *Bush v. State*, 2003 WY 156, ¶ 8, 79 P.3d 1178, ¶ 8 (Wyo.2003). The State focuses on the fact that the district court only articulated a "recommendation" that is not binding on the parole authority.

[¶ 37] We agree with Strickland that such a strong (it is included in an "IT IS ORDERED" clause, and the word "strongly" is used) recommendation in a judgment and sentence exceeds the statutory limits of the sentence that can be imposed. We are not convinced by the State's argument that because it is a mere recommendation it is not unlawful or an abuse of discretion. We consider it significant that the record reflects that Strickland's wife and son live in Natrona County. It has been held that a defendant may be banished from certain areas of a state, but such a condition must be related to the rehabilitative purposes of the sentence. *Sanchez v. State*, 234 Ga.App. 809, 508 S.E.2d 185, 186–87 (1998); *and see Commonwealth v. Thad T.*, 59 Mass.App.Ct. 497, 796 N.E.2d 869, 880 (2003) (banishment from small geographic areas all right if it serves the purposes of probation). A "banishment" may be deemed so unreasonable as to render the sentence void. *See Loving v. Commonwealth*, 206 Va. 924, 147 S.E.2d 78, 82–83 (1966). In a case more concerned with banishment of a defendant from a state or larger geographic region, rather than from a part of a state, it was held that banishment has no rehabilitative role in modern penology and is contrary to public policy. *State v. Charlton*, 115 N.M. 35, 846 P.2d 341, 343–44 (App. 1992).

[¶ 38] We conclude that portion of the sentence is unlawful and remand the sentence to the district court with directions that the offending paragraph be deleted from the Judgment and Sentence, or that it be justified by clearly articulated findings justifying the restriction on parole or other limited release, as they relate to the purposes of, *e.g.*, parole, work release, or placement in community corrections. In making such a structured examination of the relevant facts, the district court should also take into account where Strickland's wife and son reside.

## Do Strickland's Sentences Violate Double Jeopardy Principles

 [¶ 39] In issues X and XI, Strickland contends that he is, in essence, being convicted of two crimes and being punished twice when he only set fire to one house, one time. This reasoning is overly simplistic and flies in the face of established authority to the contrary. The two statutes in question are set out in footnotes 1 and 2 at the beginning of the opinion. It is clear upon cursory examination that each has an element that distinguishes it from the other. First-degree arson protects potential victims where an inhabited structure is set afire. Second-degree arson vindicates victims of insurance fraud. Strickland's argument also suffers from a reliance on the belief that "malice" must be directed to the owner of the structure. In the first section of our opinion we settled that issue.

[¶ 40] The framework for our review of this issue is summarized in *Pope v. State*, 2002 WY 9, ¶¶ 14–16, 38 P.3d 1069, ¶¶ 14–16 (Wyo.2002):

The Wyoming Supreme Court reviews claims that a constitutional right has been violated by applying our *de novo* standard of review. *Burdine v. State*, 974 P.2d 927, 929 (Wyo.1999). The Fifth Amendment to the United States Constitution and art. 1, § 11 of the Wyoming Constitution guarantee that a person will not be placed twice in jeopardy for the same offense. The double jeopardy provisions of the Wyoming and United States constitutions "have the same meaning and are coextensive in application." *Vigil v. State*, 563

P.2d 1344, 1350 (Wyo.1977). *See also Amrein v. State*, 836 P.2d 862, 864 (Wyo.1992). The double jeopardy constitutional guarantee provides three protections to persons accused of crimes:

> It protects the accused who has been acquitted against a second prosecution for the same offense; it protects the accused who has been convicted against a second prosecution for the same offense; and it protects the accused against multiple punishments for the same offense.

*Amrein*, 836 P.2d at 864. *See also Frenzel v. State*, 938 P.2d 867, 868 (Wyo.), *cert. denied* 522 U.S. 959, 118 S.Ct. 388, 139 L.Ed.2d 303 (1997); *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). We are concerned with the second protection in this case.

The statutory elements test articulated in the famous United States Supreme Court case of *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), is used by this court to analyze claims that a person has been prosecuted twice for the same offense. *See e.g., Longstreth v. State*, 890 P.2d 551, 553 (Wyo.1995). The *Blockburger* test is articulated as follows:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.

*Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182. *See also Longstreth*, 890 P.2d at 553. *Also see Umbach v. State*, 2002 WY 42, ¶ 8, 42 P.3d 1006, ¶ 8 (Wyo.2002); and *Bilderback v. State*, 13 P.3d 249, 253–55 (Wyo.2000).

[¶ 41] Strickland also relies on Wyo. Stat. Ann. § 6–3–101(b)(ii) (LexisNexis 2003), which provides that one penalty for first-degree arson is: "A fine of not more than the greater of twenty thousand dollars ($20,-000.00) or two (2) times the face amount of insurance if the fire was started to cause collection of insurance for the loss." We must, of course, evaluate these statutes as a whole, and we agree with the State that section would only affect punishment.

[¶ 42] Strickland contends that he was, in essence, tried twice for the same crime and that he is punished twice for the same crime. We conclude, as have other jurisdictions, that Strickland was properly tried, convicted, and punished for both first-degree and second-degree arson. *Land v. State*, 802 N.E.2d 45, 51–52 (Ind.App.2004) (no double jeopardy violation where defendant convicted of class B felony (arson damage to neighbor's residence) and class D felony (arson damage to his estranged wife's personal property)); *State v. Woodson*, 227 Conn. 1, 629 A.2d 386, 392 (1993) ("The obvious purpose subsection (a)(3) [of the arson statute] is to prevent and punish fraud against the fire insurance industry, fraud for which the public pays in the long run. In contrast, the purpose of subsection (a)(4) is to protect the life and limb of those public servants charged with the dangerous duty of fighting fires."); and *see Belser v. State*, 727 N.E.2d 457, 460–61 (Ind. App.2000) (defendant properly convicted of both arson causing damage to person's dwelling without that person's consent, and arson endangering human life); *People v. Walker*, 234 Mich.App. 299, 593 N.W.2d 673, 678–79 (1999) (statutes punishing destruction of property of another by any means, and burning any personal property whether owned by himself or another, protect distinct societal norms); *People v. Ayers*, 213 Mich.App. 708, 540 N.W.2d 791, 797 (1995) (convictions for arson of dwelling and for burning insured property did not violate double jeopardy).

[¶ 43] Strickland's double jeopardy rights were not violated.

## Rule 404(b) Evidence and Prosecutorial Misconduct

[¶ 44] Strickland contends he did not receive a fair trial because of numerous instances of prosecutorial misconduct, particularly with respect to the admission, or attempted admission, of evidence in violation of W.R.E. 404(b). Prosecutorial misconduct has always been condemned in this state. Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P.

52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error affected the accused's substantial rights. The accused's right to a fair trial is a substantial right. Wyo. Const. art 1, §§ 6, 9, 10. Before we hold that an error has affected an accused's substantial rights, and thus requiring the reversal of a conviction, we must be able to conclude that, based on the entire record, a reasonable possibility exists that, in the absence of error, the verdict might have been more favorable to the accused. *Williams v. State*, 2002 WY 136, ¶ 21, 54 P.3d 248, ¶ 21 (Wyo.2002); *Earll v. State*, 2001 WY 66, ¶ 9, 29 P.3d 787, ¶ 9 (Wyo.2001).

[¶ 45] W.R.E. 404(b) clearly prohibits evidence of prior bad acts to prove character disposed to criminal conduct. "Under this subsection, evidence is inadmissible if the thrust of the evidence is only to demonstrate that the defendant had a disposition to commit crimes." *Simmons v. State*, 2003 WY 84, ¶ 19, 72 P.3d 803, ¶ 19 (Wyo. 2003); and see *Howard v. State*, 2002 WY 40, ¶¶ 10-23, 42 P.3d 483, ¶¶ 10-23 (Wyo.2002).

[¶ 46] Strickland correctly points out that the district court granted a motion in limine prohibiting any mention of Strickland's treatment at the Wyoming Behavioral Institute, though he did not prohibit testing Strickland's assertions during his civil action that, because of his mental condition and the fact that he was "heavily" drugged, he was not competent to proceed. The prosecutor did broach the latter subject during his cross-examination of Strickland, but only for a purpose allowed under the district court's liminal order. Defense counsel did not object to the questions and answers at the time, and from our review of the record that is because the questions were a valid inquiry into Strickland's ability to recall with accuracy the events that occurred before, during and after the time of the fire. We find no prejudicial error in these circumstances.

[¶ 47] Strickland claims the prosecution introduced inadmissible character evidence by stating (i.e., not asking a question, although it was during cross-examination) that Strickland had "skipped out" on his bill at a Casper motel. The State did not attempt to offer any evidence to support this assertion. Defense counsel objected, and the district court sustained the objection. Nonetheless, the prosecutor persisted in arguing his position to the court, and the district court had to repeat its ruling. Given these circumstances, this can only be characterized as misconduct by the prosecutor and an apparent disregard of the applicable rules of evidence, which had been discussed in detail in preliminary motions hearings, as well as throughout the trial. Such disregard of the prosecutor's responsibilities and obligations in the criminal justice process is unacceptable. However, here the district court sustained the objection, and the jury was given both oral and written instructions to disregard any testimony for which an objection was sustained. The district court should also have specifically told the jury that it should disregard the question/statement made by the prosecutor, and defense counsel should have asked for a limiting instruction. In context, however, we think it is clear the jury was informed it could not consider that subject, and we decline to treat this unacceptable conduct as reversible error.

[¶ 48] Strickland contends the State attacked his character by eliciting testimony from a witness that he had filed a frivolous lawsuit over problems he had with his home. No objection was made to these questions, and in context we conclude the questions and answers were innocuous and not prejudicial.

[¶ 49] Strickland contends that Rule 404(b) was violated when the prosecutor asked a witness if she had to file a lien on Strickland's home because he did not pay her bill for services. She replied that she had. The prosecutor then asked if she noticed how many liens were ahead of hers. Defense counsel objected, and the district court sustained the objection. Here again the district court was remiss in not specifically instructing the jury to disregard the subject of the offending questions. And, once again both of these questions demonstrate the prosecutor's disregard of the statutory and constitutional protections afforded a defendant in the crimi-

nal justice system. In context, we find no reversible error.

[¶ 50] Strickland contends the prosecutor engaged in personal attacks on defense counsel. Personal attacks on defense counsel are impermissible. *Leiker v. State*, 994 P.2d 917, 920 (Wyo.1999). The words used by the prosecutor in this case were: "It is amazing a defense attorney who has never worked a scene, who has never investigated a fire can be an expert and disagree with the clear evidence of all the witnesses." To begin with, we will identify this as a personal attack on the defense attorney. Secondly, the argument was outside the evidence, because there was no evidence that the defense counsel or Strickland had never "worked a scene" or "never investigated a fire." This cannot be condoned as really being directed at the defendant rather than at defense counsel, as we have held in other cases, including *Leiker. See Lane v. State*, 12 P.3d 1057, 1066 (Wyo.2000). This was a personal attack on defense counsel and could only serve to undermine the integrity of the proceedings in this case. However, under the circumstances we are compelled to treat this misconduct as harmless error. W.R.Cr.P. 52(a); W.R.A.P 9.04.

[¶ 51] Strickland also contends the prosecution failed to disclose to Strickland exculpatory evidence. In part, the State's theory of the case was that Strickland was having great financial problems and that he was motivated to burn his house in order to ease his financial problems. Strickland asserts that the State did not disclose that it knew of a $22,000 check made out to Strickland that it uncovered in the course of its investigation. The government's failure to disclose evidence favorable to the defendant may deprive him of a fair trial. It is defen-

dant's burden to demonstrate that the prosecution suppressed evidence, the evidence was favorable to him, and the evidence was material. *Hensley v. State*, 2002 WY 96, ¶ 14, 48 P.3d 1099, ¶ 14 (Wyo.2002). We discern from the record that the $22,000 check was as well known to Strickland, as it was to the prosecution, so we are unable to conclude that evidence was withheld at all.

[¶ 52] Finally, Strickland contends that the misconduct of the prosecutor had a cumulative effect of depriving him of a fair trial. As previously explained, we find some of the conduct of this prosecutor to be unacceptable, but viewed in its totality we cannot conclude that it constitutes grounds to reverse Strickland's convictions.

**Cumulative Error**

[¶ 53] Strickland contends that the many errors asserted in this appeal had the cumulative effect of depriving him of a fair trial. Because we have found only very limited areas of harmless and non-prejudicial error, we will not further consider this argument. *Robinson v. State*, 11 P.3d 361, 375 (Wyo. 2000); *Kerns v. State*, 920 P.2d 632, 641 (Wyo.1996).

**CONCLUSION**

[¶ 54] The judgment of the district court is affirmed. This matter is remanded to the district court to amend the sentence imposed, as more fully set out above.